**CORRECTED OPINION**

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15911

_____

D.C. Docket No. 0:11-cr-60062-WPD-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MANUEL RODRIGUEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 16, 2013)

Before HULL and MARTIN, Circuit Judges, and BOWEN,[*] District Judge.

---

[*] Honorable Dudley H. Bowen Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

MARTIN, Circuit Judge:

Manuel Rodriguez appeals his convictions and 120-month sentence of imprisonment for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and wire fraud, in violation of 18 U.S.C. § 1343.  On appeal, Mr. Rodriguez raises two issues.  First, Mr. Rodriguez argues that there was not sufficient evidence at trial to support his convictions.  Second, Mr. Rodriguez says that the record did not establish that his offense involved more than 50 victims, so the District Court erred when it applied a 4-level sentence enhancement under United States Sentencing Guidelines (USSG) § 2B1.1(b)(2)(B).

We affirm Mr. Rodriguez's convictions because there was sufficient evidence for a reasonable trier of fact to find Mr. Rodriguez guilty beyond a reasonable doubt.  However, because the record does not support a finding that his offense involved more than 50 victims, we vacate Mr. Rodriguez's sentence and remand to the District Court for resentencing with a 2-level enhancement under USSG § 2B1.1(b)(2)(A) rather than a 4-level enhancement under § 2B1.1(b)(2)(B).

I.

On March 24, 2011, a federal grand jury sitting in the Southern District of Florida returned a nine-count indictment against Mr. Rodriguez.  The indictment charged Mr. Rodriguez with one count of conspiracy to commit wire fraud, in

violation of 18 U.S.C. § 1349, and eight counts of wire fraud, in violation of 18 U.S.C. § 1343. Before trial, the District Court dismissed one count of wire fraud (Count 4). Mr. Rodriguez proceeded to trial on the remaining counts on September 12, 2011.

A.

The evidence at trial showed that between 2003 and 2007, Mr. Rodriguez owned, operated, and participated in four different companies that sold coffee machines and other vending machines to the public. Mr. Rodriguez's companies tried to generate sales by posting ads on the Internet seeking investors who were looking to own and operate their own small businesses. When a possible investor responded to an ad, one of Mr. Rodriguez's associates would contact them and inform them about their golden opportunity to invest in a new coffee machine, vending machine, or drinking water machine.

In order to induce prospective customers to buy his products, Mr. Rodriguez and his associates gave a number of guarantees, both over the phone and in promotional materials created by Mr. Rodriguez. For example, sales people would routinely guarantee the amount of money that customers would make each day and how quickly they could recoup their investment. The companies also promised that they would provide experienced professional location specialists who would use advanced market analytics and demographic research to secure high-end

3

locations where the machines would have lots of potential patrons.  The companies promised that if the customers were to encounter any problems, they would be provided with technical support and assistance.  Best of all, the customers were told that if they were not satisfied with their purchase, they could return the machines and receive a full refund.

Mr. Rodriguez's customers found out the hard way that these guarantees were too good to be true.  After sending their money to Mr. Rodriguez, customers were told that they could expect to have their businesses up and running in weeks.  But in fact, many waited for months for their machines to arrive, if they ever arrived at all.  When the machines did finally arrive, many customers found that they did not work or that they cost more to operate than had been advertised.

Mr. Rodriguez's customers were also disappointed by the locations secured by the professional location specialists.  Instead of having their machines placed at high-end venues where they could sell hundreds of items each day, customers were forced to settle for remote locations where they could barely cover their operational costs.  Many customers testified that the machines generated zero profits or substantial losses.  This, in the face of the 300-700% profit they had been promised.  None of the customers said they had been able to recoup the cost of their initial investment.

Unsurprisingly, customers became frustrated and asked Mr. Rodriguez for help. Most of these customers, however, discovered that the technical support and assistance they had been promised was nowhere to be found. When they asked for a change in location, it didn't happen. And when customers asked for refunds, Mr. Rodriguez almost never honored his money-back guarantee.

Finally, the evidence at trial also showed that Mr. Rodriguez knew that all of this was happening, yet he continued to sell his machines to customers and guarantee profit figures which he knew were not real. Despite the number of complaints that Mr. Rodriguez received, new customers were told that failure was not a possibility. When prospective customers asked to speak to current investors, Mr. Rodriguez routinely supplied fake references. Sometimes Mr. Rodriguez even falsely stated that he owned the machines himself and that they were profiting and doing well for him. Beyond that, even after Mr. Rodriguez was served a cease and desist order from the Maryland Attorney General and told his customers that he was closing his company due to bankruptcy, Mr. Rodriguez simply created new companies selling different machines. In the Articles of Incorporation for one of his later companies, Mr. Rodriguez named his mother the President and CEO so that prospective customers could not tie the troubles of his earlier companies back to him. Mr. Rodriguez also drafted disclosure documents without mention of prior

5

litigation, prior sanctions, or bankruptcies, and sent them to his prospective customers.

At the close of the government's case, the District Court dismissed an additional wire fraud count. On September 28, 2011, the jury returned its verdict, convicting Mr. Rodriguez of all remaining counts.

## B.

Mr. Rodriguez was sentenced on December 7, 2011. The government sought a 4-level sentence enhancement under USSG § 2B1.1(b)(2)(B), arguing that Mr. Rodriguez's offense involved 50 or more victims. In support of this enhancement, the government submitted 42 affidavits from victims who sustained a loss after buying Mr. Rodriguez's machines, as well as a summary chart indicating a total of 238 victims. Mr. Rodriguez objected and argued that there was insufficient evidence in the record to show that the offense involved more than 50 victims. Nevertheless, the District Court reasoned that out of 238 customers who bought machines from Mr. Rodriguez, there must have been at least 50 victims. As a result, the District Court applied a 4-level sentence enhancement under USSG § 2B1.1(b)(2)(B).

## II.

## A.

6

Mr. Rodriguez first argues that there was not sufficient evidence to support his convictions. He suggests that the government's evidence at most establishes that he engaged in "mere puffery" in connection with the sale of his business opportunities, but not fraud. This is especially true, he claims, because he told all of his customers up front that there was substantial risk involved in purchasing one of his machines.

We review de novo a district court's denial of judgment of acquittal on sufficiency of evidence grounds. United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007). In reviewing a sufficiency of the evidence challenge, we consider the evidence in the light most favorable to the government, drawing all reasonable inferences and credibility choices in the government's favor. Id. A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt. United States v. Herrera, 931 F.2d 761, 762 (11th Cir. 1991). The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial. United States v. Poole, 878 F.2d 1389, 1391 (11th Cir. 1989) (per curiam). But when the government relies on circumstantial evidence, the conviction must be supported by reasonable inferences, not mere

7

speculation.  United States v. Friske, 640 F.3d 1288, 1291 (11th Cir. 2011)

(quotation marks omitted).

We have held that in order to support a conviction for wire fraud, the

evidence at trial must show that a defendant (1) intentionally participated in a

scheme or artifice to defraud another of money or property, and (2) used or caused

the use of wires for the purpose of executing the scheme or artifice.  United States

v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007).  Similarly, in order to sustain a

conviction for conspiracy to commit wire fraud, the government must prove that

the defendant "knew of and willfully joined in the unlawful scheme to defraud."

United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009).

It is true that "puffing" or "sellers' talk" is not a crime under federal fraud

statutes.  See United States v. Martinelli, 454 F.3d 1300, 1317 (11th Cir. 2006); see

also United States v. Brown, 79 F.3d 1550, 1557 (11th Cir. 1997) (quoting with

approval United States v. Pearlstein, 576 F.2d 531, 540 n. 3 (3d Cir. 1978) for

proposition that statements that a company is "nationally known" and that the

product is "among the finest . . . in the world" are not cognizable under the federal

mail fraud statute) (overruled on other grounds by United States v. Svete, 556 F.3d

1157 (11th Cir. 2009)).  Instead, fraud requires proof of a "material

misrepresentation, or the omission or concealment of a material fact calculated to

deceive another out of money or property."  Maxwell, 579 F.3d at 1299.

8

We affirm Mr. Rodriguez's convictions because a reasonable jury could have found that his misrepresentations to his customers surpassed mere puffery or "sellers' talk." The evidence at trial showed that Mr. Rodriguez did not simply puff up the profitability of his machines to prospective customers. Rather, he made material misrepresentations of fact in the course of an ongoing scheme to defraud them. See United States v. Majors, 196 F.3d 1206, 1211 (11th Cir. 1999) (defendant surpassed puffing or sellers' talk by serving as an officer of fraudulent corporations, signing newsletters and corporate literature with false statements, attending meetings, and knowingly and voluntarily participating in scheme to defraud investors).

For example, Mr. Rodriguez's customers did not testify that they were simply given an opinion or an assurance that their investments were going to be successful. Rather, Mr. Rodriguez guaranteed specific profit figures and provided a definitive time frame for when his customers would recoup their investments. He did this even though he knew his representations were completely unfounded. Mr. Rodriguez's sales associates also promised expert location specialists who would use advanced research analytics to secure profitable locations for the machines. Mr. Rodriguez knew all the while, however, that his locators used absolutely no research and placed his customers' machines haphazardly in unprofitable locations. On top of all this, even though a number of customers

9

asked for refunds and received nothing, Mr. Rodriguez continued to promise prospective customers that if they were not satisfied with their machines, they could get a full refund and all their money back. The jury could reasonably infer that these patently false promises far surpassed "sellers' talk" or "mere puffery."

The evidence at trial also showed that Mr. Rodriguez was not just overstating the facts to sell his products to customers. He was also actively concealing relevant information from potential customers as part of his scheme to defraud. When prospective customers asked to speak to current investors, Mr. Rodriguez frequently gave fake references or falsely stated that he owned the machines himself. And even after the Maryland Attorney General ordered him to cease and desist from selling his products and telling his customers that he was filing for bankruptcy, Mr. Rodriguez simply formed a new company—naming his mother as CEO—so that he could continue his scheme. Because a reasonable jury could find that these types of concealments surpassed "sellers' talk" or "mere puffery," we conclude that there was sufficient evidence to support Mr. Rodriguez's convictions.

### B.

In fraud cases, the Sentencing Guidelines provide for certain enhancements to the base offense level depending on the number of victims. If there are 10 or more victims, there is a 2-level enhancement; if there are 50 or more victims, there

is a 4-level enhancement; and for 250 or more victims, there is a 6-level enhancement.  See USSG § 2B1.1(b)(2)(A)–(C).   Before the sentencing hearing, Mr. Rodriguez filed written objections to the 4-level enhancement recommended in the Presentence Investigation Report.  Mr. Rodriguez's objection argued that the government had proved only 10 victims and that therefore the offense level should only be raised by two levels.

Mr. Rodriguez argues that the District Court clearly erred when it found that his offense involved more than 50 victims.  Although he acknowledges that the government presented 42 affidavits of victims who suffered a loss and a summary chart indicating that there were 238 victims total,  he points out that the government provided no witnesses or underlying data to authenticate the government's summary chart. For this reason, Mr. Rodriguez argues that the District Court's finding is not supported by reliable and specific evidence.  We agree.

This Court reviews de novo the interpretation and application of the Guidelines, and reviews underlying factual findings, including the District Court's calculation of the number of victims, for clear error.  United States v. Foley, 508 F.3d 627, 632 (11th Cir. 2007); United States v. Lee, 427 F.3d 881, 892, 894–95 (11th Cir. 2005) (applying clear error review to the District Court's determination of number of victims).  "Although review for clear error is deferential, a finding of

11

fact must be supported by substantial evidence." United States v. Robertson, 493 F.3d 1322, 1330 (11th Cir. 2007).

"When a defendant challenges one of the factual bases of his sentence . . . the Government has the burden of establishing the disputed fact by a preponderance of the evidence." United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995). "It is the district court's duty to ensure that the Government carries this burden by presenting reliable and specific evidence." Id. While estimates are permissible, courts "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." United States v. Sepulveda, 115 F.3d 882, 890 (11th Cir. 1997) (quotation marks omitted). Additionally, "the law of this Circuit clearly provides that reliable hearsay can be considered during sentencing." United States v. Zlatogur, 271 F.3d 1025, 1031 (11th Cir. 2001); United States v. Wilson, 183 F.3d 1291, 1301 (11th Cir. 1999) ("A court may consider any information (including hearsay), regardless of its admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that the information is sufficiently reliable."). Absent a stipulation or agreement between the parties, however, an attorney's factual assertions alone do not constitute evidence that a District Court can rely on. United States v. Washington, 714 F.3d 1358, 1361 (11th Cir. 2013).

12

The District Court clearly erred when it found that Mr. Rodriguez's offense involved more than 50 victims. The only evidence presented to the Court suggesting that there were more than 50 victims was the summary chart proffered by the government. The prosecution presented no witnesses to authenticate what the chart represented, how it was prepared, or by whom. While the district court could consider trial evidence, there was no testimony or evidence tying the summary chart to any of the trial evidence either. Neither did the prosecution present any witnesses or evidence to verify that the information in the chart was correct. In essence, the summary chart amounted to little more than an allegation by the government on a piece of paper that Mr. Rodriguez's offense involved more than 50 victims. See Washington, 714 F.3d at 1361 (representations by the government at sentencing that there were more than 250 victims were insufficient); United States v. Lawrence, 47 F.3d 1559, 1568 (11th Cir. 1995) (holding that "perfunctory summaries of the evidence that the Government stood ready to present" were not evidence). The government failed to present any evidence to establish that Mr. Rodriguez's offense involved more than 50 victims. See Sepulveda, 115 F.3d at 890. Therefore, Mr. Rodriguez's sentence should not have been enhanced by four levels based on such a finding.[1]

---

[1] We reject the government's argument that Mr. Rodriguez waived his objection to the summary chart as evidence of the number of victims. When the government proffered the chart to the

13

III.

We affirm Mr. Rodriguez's convictions.  However, the 4-level enhancement under USSG § 2B1.1(b)(2)(B) is set aside, and the case is remanded for resentencing without that enhancement.  The District Court should impose a 2-level enhancement under USSG § 2B1.1(b)(2)(A) because Mr. Rodriguez has conceded on appeal that there were 10 or more victims of his conduct.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

---

district court, counsel for Mr. Rodriguez expressly objected to the chart as an improper way to prove the amount of victims.

BOWEN, Senior District Judge, specially concurring:

I concur in the opinion in full. I write specially to comment on the Government's treatment of the sentencing proceedings.

This is another case wherein the Government has failed to come forward with evidence at a critical time. Unfortunately, important objections made by a defendant at a sentencing hearing are often dealt with as an afterthought. The Government's cavalier disregard for the need of further evidence, specific references to a trial transcript, or another basis upon which the district court may make sustainable findings is all too typical. In this case, after a laboriously conducted two-week trial, resulting in a conviction we readily affirm, the Government's willingness to allow the matter to conclude resting upon extrapolation, conjecture, and innuendo left the district court stranded with a well-prepared Presentence Investigation Report, some commentary, and little else.

A district court's factual findings at a sentencing hearing are reviewed using the deferential standard of "clear error." United States v. Foley, 508 F.3d 627, 632 (11th Cir. 2007). Here, as a consequence of the Government's lackadaisical approach, we are ultimately "left with the definite and firm conviction that a mistake has been committed." United States v. McDaniel, 631 F.3d 1204, 1209 (11th Cir. 2011). The Government's inaction encouraged the district court to speculate as to the amount of loss and the number of victims. Why the Executive

15

Branch would expend its resources in extensive, indeed intricate, investigation and prosecution of this case, only to approach its culmination (the sentencing event) with such laxity, is a mystery.

It is true that a sentencing proceeding is more flexible and less formalized than a trial to a jury. See, e.g., Foley, 508 F.3d at 633 ("[T]he [Sentencing] Guidelines require a district court to take into account not merely the charged conduct, but rather all relevant conduct, in calculating a defendant's offense level.") (citation and internal quotation marks omitted); United States v. Zlatogur, 271 F.3d 1025, 1031 (11th Cir. 2005) (observing that a district court may consider "reliable hearsay" during sentencing). During sentencing, The Government need only establish a disputed fact by a preponderance of the evidence. United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995). Further, the district court can rely upon its recollection of the evidence of the trial to make its findings. United States v. Hamaker, 455 F.3d 1316, 1338 (11th Cir. 2006) ("The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the [Presentence Investigation Report], or evidence presented during the sentencing hearing.") (citation and internal quotation marks omitted).

I fear that the latitude allowed in sentencing proceedings often lulls the Government's lawyers into a species of spectator. However, the lower standard of

16

proof, the district court's wide discretion, and the degree of informality in no way lessen the importance or the due process implications of the event.  See United States v. Gupta, 572 F.3d 878, 887-88 (11th Cir. 2009) (observing that "the Government['s] burden of establishing the disputed fact by a preponderance of the evidence . . . must be satisfied with reliable and specific evidence" and that "a district court must make factual findings sufficient to support the government's claim . . . .") (emphasis added) (citations and internal quotation marks omitted).  Thus, the significance of the Government's participation continues from the commencement of the case to its conclusion.

In fairness to the district court, findings made at a sentencing hearing are often entered months after a trial, following other trials, adversary proceedings, contested matters, and numerous matters in litigation.  The United States Probation officers correctly concentrate on the preparation of a Presentence Investigation Report, which may include evidentiary matters, opinions, conclusions, and recommendations based on subjective criteria.  When facts in the Presentence Investigation Report are disputed, however, the district court needs more.  No one is better positioned than trial counsel for the Government to anticipate and satisfy the need for articulation, protection, and supplementation of the record with the testimony of witnesses, necessary exhibits, or other evidence.  Too often, energetic, successful prosecutors approach what is arguably the most important

17

part of the case with a surprising level of inexactitude.  Responsible advocacy demands more.